1           **UNITED STATES DISTRICT COURT**
          **SOUTHERN DISTRICT OF TEXAS**
2              **HOUSTON DIVISION**

3

4    UNITED STATES OF AMERICA      *      11-CV-2659
                                   *      Houston, Texas
5    VS.                           *
                                   *      March 27, 2012
6    $35,131.00 IN U.S.            *      9:06 a.m.
     CURRENCY
7

8                     **BENCH TRIAL**

9

      **BEFORE THE HONORABLE LYNN N. HUGHES**
10         **UNITED STATES DISTRICT JUDGE**

11
     **APPEARANCES:**
12
     **FOR THE GOVERNMENT:**
13   Albert T. Ratliff
     U.S. ATTORNEY'S OFFICE
14   P.O. Box 61129
     Houston, Texas 77208
15   713.567.9579

16   CASE AGENT:  Min Tran

17
     **FOR THE DEFENDANT:**
18   Bryce Lee Callahan and J. Cambell Barker
     **YETTER, COLEMAN, LLP**
19   909 Fannin, Suite 3600
     Houston, Texas 77010
20   713.632.8000

21

22   Court Reporter:
     Johnny C. Sanchez, RPR, RMR, CRR
23   515 Rusk, #8016
     Houston, Texas 77002
24   713.250.5581

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-assisted transcription.

1          THE COURT:  Thank you.  Please be seated.  All

2    right.  We have two exhibits from the government, is there

3    an objection to either?

4          MR. CALLAHAN:  No, Your Honor.

09:06:14   5          THE COURT:  Exhibit, we have five exhibits from

6    the claimants, is there an objection?

7          MR. RATLIFF:  No, Your Honor.

8          THE COURT:  They're all admitted.  Would

9    everyone who expects to be called as a witness, please

09:06:30  10    stand and then raise your right hand, please.

11          MR. RATLIFF:  Your Honor, the agent is bringing

12    all the officers.

13          THE COURT:  Does she have her hand up?

14          MR. CALLAHAN:  Yes.  Do each of you solemnly

09:07:06  15    swear that the testimony that you give will be the truth,

16    the whole truth and nothing but the truth?

17          IN UNISON:  (Answered affirmatively).

18          THE COURT:  You're not going to testify, Agent?

19          CASE AGENT:  No, sir.

09:07:20  20          THE COURT:  What are you doing here, Agent?

21          CASE AGENT:  I'm the case agent.

22          MR. RATLIFF:  Your Honor, he'll be assisting me

23    throughout the trial.

24          THE COURT:  Pardon?

09:07:29  25          MR. RATLIFF:  He'll be assisting me throughout

1  the trial.

2              THE COURT:  And is he with the agency?

3              MR. RATLIFF:  Yes, Your Honor.  He's a special

4  agent with the Department of Homeland Security.  He's the

09:07:41  5  case agent for this case.

6              THE COURT:  All right.  I'm sorry.  But y'all

7  have to wait in the hall.  It's only slightly duller out

8  there.  Any other preliminary matters?

9              MR. CALLAHAN:  Nothing from us, Your Honor.

09:08:02  10              MR. RATLIFF:  Nothing from the government, Your

11  Honor.

12              THE COURT:  All right.  Call your first

13  witness, please, sir.

14              MR. RATLIFF:  The government calls Officer

09:08:08  15  Hernandez.

16              THE COURT:  Sit up here, please, sir, and you

17  can't move the chair, so you have to move the microphone

18  right in front of you.  It's cheap government equipment,

19  what you're used to, to make sure it's right close in in

09:08:44  20  front of you.

21              All right, Mr. Ratliff.

22

23

24

25

1                              **AUGUSTIN HERNANDEZ, III,**

2    after having been first cautioned and duly sworn, testified

3    as follows:

4                              **DIRECT EXAMINATION**

09:08:53   5    BY MR. RATLIFF:

6      **Q.**    Officer Hernandez, please state your full name for

7      the record.

8      **A.**    Agustin Hernandez, III.

9      **Q.**    And where do you work, sir?

09:09:00   10   **A.**    I work at George Bush Intercontinental Airport.

11     **Q.**    Which agency do you work for?

12     **A.**    U.S. Department of Homeland Security Customs and

13     Border Protection.

14     **Q.**    And what is your position with them?

09:09:08   15   **A.**    I am a CPPO officer.

16     **Q.**    What are your general duties?

17     **A.**    Generally I'm assigned to the outbound in the

18     currency division.

19     **Q.**    Sir, I direct your attention to June 2nd of last

09:09:22   20   year.  Were you on duty at that time?

21     **A.**    Yes, sir.

22     **Q.**    Were you conducting a screening operation for an

23     outbound flight?

24     **A.**    Yes.

09:09:31   25   **Q.**    Which flight was that?

1 **A.**   I believe it was EK 214, the Emirates flight,

2 destined for Dubai.

3 **Q.**   What are your duties as the screener of that flight?

4 **A.**   I was one of the two screen officers.

09:09:42   5 **Q.**   I show you --

6          MR. RATLIFF:  May I approach the witness?

7          THE COURT:  He answered the question, but

8 what's a screening officer do?

9          MR. RATLIFF:  I'm sorry, Your Honor?

09:10:00  10          THE COURT:  He said he's one of two screening

11 officers.

12          MR. RATLIFF:  Yes.

13          THE COURT:  I want to know what the function of

14 a screening officer is.

09:10:06  15          MR. RATLIFF:  Yes, Your Honor.

16 BY MR. RATLIFF:

17 **Q.**   Officer Hernandez, please explain what a screen

18 officer does.

19 **A.**   The screening officer asks each passenger who's about

09:10:16  20 to board for departure from the United States, ask them if

21 they were transporting or carrying in excess of $10,000 in

22 monetary instruments from the country, Your Honor.

23          THE COURT:  Okay.

24 BY MR. RATLIFF:

09:10:29  25 **Q.**   Officer Hernandez, for that flight, was there a

1  posted display listing the currency reporting

2  requirements?

3  **A.**   Yes, sir.

4           MR. RATLIFF:  May I approach the witness, Your

09:10:41  5  Honor?

6           THE COURT:  Yes, sir.

7  BY MR. RATLIFF:

8  **Q.**   Officer Hernandez, I show you what's been marked as

9  Plaintiff's Exhibit Number 1.  Do you recognize this

09:10:52  10  exhibit?

11  **A.**   Yes, sir.

12  **Q.**   And what is it?

13  **A.**   It is the notice that we have out front by the jet

14  way for passengers to view upon their departure from the

09:11:02  15  country.

16  **Q.**   Thank you.

17           And in relationship to the ticket counter

18  where the passengers have to give their ticket before they

19  go down the jet way, and where you were stationed, where

09:11:22  20  was this sign displayed?

21  **A.**   It is between the actual gate where the passenger

22  gets their ticket, and between where we stand.

23  **Q.**   And where were you standing?

24  **A.**   I was standing directly in front of the door leading

09:11:37  25  to the ramp to the flight.

1   Q.   Did there come a time that Mr. and Mrs. Jones as

2   passengers approached you?

3   A.   Yes.

4   Q.   And will you tell the Court what happened.

09:11:52   5   A.   I proceeded to ask both passengers for their

6   passports to verify their identity upon departure from the

7   U.S.  I asked them if they were carrying more than $10,000

8   in currency or monetary instruments between the both of

9   them out of the country at that particular time.

09:12:08   10   Q.   And what response did they give you?

11   A.   Mr. Jones responded that they were carrying $20,200

12   out of the country between the two of them.

13   Q.   Now, Mr. Hernandez, Officer Hernandez, when you were

14   speaking to them, how close were you to them?

09:12:26   15   A.   Approximately two, three feet, sir.

16   Q.   And what tone of voice were you speaking to them?

17   A.   In a pretty low tone, but loud enough for them to

18   hear me and be able to respond.

19   Q.   And when you first told them about -- you asked them

09:12:41   20   about the funds that they were carrying, how close was Mr.

21   and Mrs. Jones to you?

22   A.   Approximately two to three feet, sir.

23   Q.   And was your question directed at both of them?

24   A.   Yes.

09:12:53   25   Q.   And after Mr. Jones gave his answer, what did you do?

**A.**   I explained that it was not against the law to carry
more than 10,000 but he had to report it to U.S. Customs
prior to his departure.

**Q.**   And did he say anything in response to that?

09:13:12   **A.**   No.   He said that all he was carrying -- actually, he
said all he was carrying was $20,200.

**Q.**   And after he told you the second time that amount,
what did you do?

**A.**   I wrote the amount that he reported to me on the
09:13:27   FinCen 105 Form, which is the form required by law for a
person to fill out upon departure, and I wrote down
$20,200.   I verified it with Mr. Jones.   I showed him the
amount, and then asked him, "If this is correct, sign your
name right here," and he signed his name on the proper
09:13:44   place on the form.

                    MR. RATLIFF:   May I approach the witness, Your
Honor?

                    THE COURT:   Yes, sir.

BY MR. RATLIFF:

09:13:53   **Q.**   Officer Hernandez, I show you what's been marked as
Plaintiff's Exhibit Number 1.   Do you recognize that
document?

**A.**   Yes, sir.

**Q.**   Is that the FinCen 105 that you just testified about?

09:14:08   **A.**   Yes, sir.

1  **Q.**   And do you see Mr. Jones' signature on that document?

2  **A.**   Yes, sir.

3  **Q.**   After Mr. Jones signed that document, what happened

4  next?

09:14:17  5  **A.**   I then instructed him that he was going to be going

6  down to a verification -- currency verification table,

7  where other officers would then verify his amount,

8  complete the form.  They would instruct him as far as what

9  the form was about, and how to complete it.

09:14:37  10  **Q.**   Now, what happened to the form?

11  **A.**   I gave the form, along with his passports to him, and

12  he carried the form with the passports down to the

13  inspection area.

14  **Q.**   And the inspection area was about 17 feet away;

09:14:50  15  correct?

16  **A.**   Correct.

17         MR. RATLIFF:  No further questions, Your Honor.

18 I pass the witness.

19         THE COURT:  Mr. Callahan?

09:15:03  20         MR. CALLAHAN:  Your Honor, may I approach to

21 give him an exhibit book?

22         THE COURT:  Yes, sir.

23         MR. CALLAHAN:  Just turn to the number.

24         THE WITNESS:  Okay.

09:15:18  25

**CROSS-EXAMINATION**

BY MR. CALLAHAN:

**Q.**   Agent Hernandez, it's perfectly legal for Mr. Jones to carry $31,131 in currency in traveler's checks out of the country; correct?

**A.**   Yes.

**Q.**   Now, if you would, if you'd turn to Claimant's Exhibit 1, I believe is the form that you were just looking at for Mr. Ratliff.

Now, you wrote $20,200 down on this form, did you not?

**A.**   Correct, yes, sir.

**Q.**   And the form was blank, other than your notation of $20,200, when you told Mr. Jones to sign it; correct?

**A.**   Correct.

**Q.**   Now, in the jet way, you asked Mr. Jones how much U.S. currency that he and his wife had on them; correct?

**A.**   Correct.

**Q.**   And Mr. Jones told you initially that he didn't know; correct?

**A.**   Correct.

**Q.**   Now, did you ask Mr. Jones rhetorically about, "You don't know how much U.S. currency you have on you?"

**A.**   Excuse me?  Can you repeat that?

**Q.**   Did you ask Mr. Jones a rhetorical questions that

said, "You don't how much U.S. currency you had on you?"

        THE COURT:  That's not a rhetorical question.

        MR. CALLAHAN:  Well, in response to Mr. Jones saying that he didn't know how much currency he had.

        THE WITNESS:  I don't remember asking him that, sir.

BY MR. CALLAHAN:

**Q.**   You also asked Mr. Jones how many dollars he had on him; correct?

**A.**   Correct.

**Q.**   And Mr. Jones told you that he guessed he had $20,200; correct?

**A.**   Correct.  He informed me he was carrying $20,200.

**Q.**   And then you wrote that number down on Exhibit 1; correct?

**A.**   Correct.

**Q.**   Now, you never asked Mrs. Jones, Mrs. Berekti Jones, you never had her sign a FinCen 105 Form, did you?

**A.**   No, sir.

**Q.**   Now, Agent Hernandez, you're not aware of any evidence that the funds seized from Mr. and Mrs. Jones were the result of any criminal activity, do you?

**A.**   No, I don't.

**Q.**   And you're not aware that the Joneses were the subject of any criminal investigation related to this

1 matter; correct?

2 **A.**   No, sir.

3              MR. CALLAHAN:  Thank you.

4              MR. RATLIFF:  Your Honor, may I follow up one

09:17:20  5 question on redirect?

6              THE COURT:  Yes, sir.

7                    **REDIRECT EXAMINATION**

8 BY MR. RATLIFF:

9 **Q.**   Officer Hernandez, when you spoke to Mr. and Mrs.

09:17:28 10 Jones, did you just ask them about cash or did you ask

11 them about monetary instruments also?

12 **A.**   I asked them about all monetary instruments.

13              THE COURT:  Wait a minute.  I didn't hear that.

14              THE WITNESS:  I asked them about all monetary

09:17:42 15 instruments, Your Honor.

16              THE COURT:  Earlier you said you asked them

17 about currency.

18              THE WITNESS:  When the initial questioning

19 happened on the jet way, I include currency, monetary

09:17:53 20 instruments, traveler's checks, money orders, and any money

21 they're carrying for themselves or --

22              THE COURT:  Why didn't you say that when you

23 were asked the question the first time?  You talked about

24 cash.  You answered his question about cash.

09:18:11 25              THE WITNESS:  Well, that included the other

1 type of monetary instruments.

2      THE COURT:  No, it doesn't.  Cash is something

3 that the Federal Reserve prints.  What American Express

4 prints may be the functional equivalence is not cash, is

5 it?

6      THE WITNESS:  No, it's not, sir.

7 BY MR. RATLIFF:

8 **Q.**  Officer Hernandez, would you tell the Court verbatim

9 what you first asked the Joneses when they first

10 approached you.

11 **A.**  I asked them --

12 **Q.**  Exactly verbatim.

13 **A.**  I asked them if, as a family, if they were

14 transporting in excess of $10,000 in checks, traveler's

15 checks, currency, monetary instruments for themselves or

16 anybody else.

17 **Q.**  Were your questions ever limited to, "How much cash

18 are you carrying?"

19 **A.**  No.

20      MR. RATLIFF:  No further questions, Your Honor.

21      MR. CALLAHAN:  I have already asked him my

22 questions.

23      THE COURT:  May he go?  Call your next witness.

24 Thank you, sir.  Call your next witness.

25      Mr. Ratliff?

*Direct-Davila/By Mr. Ratliff*

1                              **DAVID DAVILA,**

2  after having been first cautioned and duly sworn, testified

3  as follows:

4                          **DIRECT EXAMINATION**

09:20:09  5  BY MR. RATLIFF:

6    **Q.**    Officer Davila, please state your full name for the

7    record.

8    **A.**    David Davila.

9    **Q.**    And what agency do you work for?

09:20:16  10  **A.**    I work for the Department of Homeland Security.

11  **Q.**    And what position do you have with them?

12  **A.**    I'm an officer, Customs officer.

13  **Q.**    Now, directing you to June 2nd of last year, were you

14  part of an enforcement team screening a flight to Dubai

09:20:34  15  from Bush Airport?

16  **A.**    Yes, sir.

17  **Q.**    And what were your duties as part of that screening

18  team?

19  **A.**    My duties were to wait at the end of the jet way if

09:20:48  20  any passengers were going to be sent down for baggage and

21  any issues.

22  **Q.**    While you were on duty, were Mr. and Mrs. Jones sent

23  down to your table for verification of funds?

24  **A.**    I believe they were sent down to the table that

09:21:05  25  Officer Clark was working, and I was there assisting them

*Direct-Davila/By Mr. Ratliff*

1    also.

2    **Q.**    When they got to the verification table, what was

3    asked of them?

4    **A.**    Officer Clark had asked the passengers if they could

5    place all the currency in their possession on top of the

6    table for the currency verification.

7              MR. BARKER:  Your Honor, is this hearsay?  We

8    object to this as hearsay.

9              THE COURT:  Did you do it?  Did you ask the

10   question?

11             THE WITNESS:  No, sir.  It was Officer Clark

12   that asked the questions.

13             THE COURT:  Where were you when he asked?

14             THE WITNESS:  I was right next to him.

15             THE COURT:  Technically you're right, but

16   practically it's just me.  Go ahead.

17   BY MR. RATLIFF:

18   **Q.**    Officer Davila, do you recall what was placed on the

19   table by the Joneses?

20   **A.**    No, sir, I can't really remember what it was placed

21   on the table.

22   **Q.**    What did you do in relationship to the Joneses while

23   they were at the verification table?

24   **A.**    After Officer Clark had told them to place all the

25   currency on top of the table.  I asked the Joneses if the

*Direct-Davila/By Mr. Ratliff*

1  luggage -- any carryons they were carrying was theirs, and

2  if everything inside the luggage or bags or any carryon

3  they had, they took responsibility for everything inside

4  them, which they stated, "Yes."

09:22:41  5            Then I proceeded to ask any carryons they

6  had and just searched through them.

7  **Q.**   Okay.  Did you find any currency or monetary --

8            THE COURT:  Ask, "What did you find?"

9            MR. RATLIFF:  I'm very sorry.

09:22:54  10           THE COURT:  Direct questions.

11           MR. RATLIFF:  I'm very sorry, Your Honor.

12  BY MR. RATLIFF:

13  **Q.**   What, if anything, did you find during your search of

14  their luggage or belongings?

09:23:03  15  **A.**   The only thing I found was currency that was hidden

16  on the wife, inside her purse.

17  **Q.**   Okay.  And do you recall how much those funds were?

18  **A.**   I believe it was about 4,000.

19  **Q.**   And what else did you do besides inspect their bags?

09:23:25  20  **A.**   After I inspected the bags, I began to fill out this

21  paperwork here in front of me.

22  **Q.**   And by "paperwork," are you referring to what's been

23  marked as Plaintiff's Exhibit Number 1?

24  **A.**   Yes, sir.

09:23:42  25  **Q.**   And on Plaintiff's Exhibit Number 1, what, if

*Direct-Davila/By Mr. Ratliff*

1  anything, did you fill out?

2  **A.**    I proceeded to fill out the top part, Part 1.

3  **Q.**    And the information that you placed in Part 1, where

4  did you get that information?

09:24:00  5  **A.**    The name, the date of birth, the country of

6  citizenship, and passport number and country were all

7  taken from the passenger's passport.  All that information

8  is on the front page of the passport, on the validation

9  page.

09:24:21  10  **Q.**    Now, what if any information that was not from the

11  passport that's on this document now?

12  **A.**    The passenger's address, that one I got from the

13  passenger.  I asked him for -- if he had a driver's

14  license, which he did, he handed it over.  I asked him if

09:24:39  15  everything on the driver's license is true and correct, as

16  far as the address.  He said, "Yes."  So I went ahead and

17  wrote down the address that was on the driver's license.

18          The Social Security number, I asked him if

19  he had a Social Security number with him.  He said, "No."

09:24:55  20  So I asked him if he knew it, which he did, and he

21  proceeded to give it to me and I wrote it down, the

22  Number 2.

23  **Q.**    Where did you get the information as to their

24  destination?

09:25:07  25  **A.**    The destination, I asked them what his final

*Cross-Davila/By Mr. Barker*

1   destination was.  And he told me it was a city in

2   Ethiopia.  I didn't know how to spell it, so I asked him

3   if he could spell it for me, and he gave me the wording on

4   it, the city name.

09:25:23   5   **Q.**   Did there come a time when it was discovered that

6   more than $20,200 was in the possession of the Joneses?

7   **A.**   Yes.  I think when Officer Boyd got the passenger's

8   jacket, he found a package in there, and placed it on top

9   of the table.

09:25:47   10   **Q.**   And after that discovery, what happened next?

11   **A.**   After that, we called our supervisor and told him of

12   what we found.  And in return, called our chief, which is

13   our watch commander, he makes all the decisions, and he

14   decided -- he called our supervisor and the supervisor

09:26:09   15   called us and told us that -- to seize the money.

16   **Q.**   And where were the Joneses taken to?

17   **A.**   The Joneses and all the other officers all went back

18   together, back to our Customs baggage secondary.

19                MR. RATLIFF:  No further questions, Your Honor.

09:26:28   20                THE COURT:  Mr. Barker?

21                          **CROSS-EXAMINATION**

22   BY MR. BARKER:

23   **Q.**   Officer Davila, how far away was the inspection table

24   that you were working at from Officer Hernandez?

09:26:51   25   **A.**   I would say it's about 30 feet.

*Cross-Davila/By Mr. Barker*

1   Q.   Did you witness any of Officer Hernandez'

2   interactions with either of Mr. or Mrs. Jones?

3   A.   No, sir.

4   Q.   And at the inspection table, did you say that Mrs.

09:27:08  5   Jones and Mr. Jones took full responsibility for what was

6   in the luggage?

7   A.   Yes, sir.

8   Q.   Did you direct Mrs. Jones to be put her purse on the

9   inspection table, or did another officer do that?

09:27:22  10   A.   I don't recall.

11   Q.   And where was the currency that Mrs. Jones had in her

12   possession?

13   A.   It was inside her purse.

14   Q.   And was the purse something that she produced to you

09:27:37  15   voluntarily?

16   A.   I don't recall.  I might have asked for it.  I'm not

17   real sure if she handed it over or I asked for it.  I

18   don't recall.

19   Q.   But in either event, are you contending that she

09:27:49  20   tried to hide her purse from you?

21   A.   No, sir.

22   Q.   And did you see Mr. Jones try to hide anything from

23   you at the inspection table?

24   A.   No, sir.

09:28:04  25   Q.   Before you demanded of the Joneses to put all of

*Cross-Davila/By Mr. Barker*

1  their currency -- I think you said "currency" in your

2  words -- on the table, did you explain to them that they

3  had to declare traveler's checks on their reporting form?

4  **A.**   No, sir.

09:28:19  5  **Q.**   Have you criminally investigated either of the

6  Joneses for the facts relating to the trial today?

7  **A.**   No, sir.

8  **Q.**   Are you aware of any evidence that the funds came

9  from an illegal source?

09:28:37  10  **A.**   No, sir.

11  **Q.**   Are you aware of any evidence that the funds were

12  going to be spent in an illegal manner?

13  **A.**   (Answered negatively).

14          MR. BARKER:  No further questions.

09:28:45  15          THE COURT:  Mr. Ratliff?

16          MR. RATLIFF:  No further questions, Your Honor.

17          THE COURT:  You may step down.  Thank you, sir.

18  Call your next witness, please.

19          Mr. Ratliff, what was his name?

09:29:11  20          MR. RATLIFF:  Davila.

21          THE COURT:  Davila?

22          MR. RATLIFF:  D-A-V-I-L-A, I believe, Your

23  Honor.

24          THE COURT:  I used to have a friend named

09:29:20  25  Davila.

*Direct-Boyd/By Mr. Ratliff*

1      MR. RATLIFF:  And his first name is David, Your

2  Honor.

3      THE COURT:  Okay.  I just need last names.

4      Good morning, sir.

09:29:32   5      THE WITNESS:  Good morning, sir.

6      THE COURT:  You can't move the chair, so you

7  have to move the microphone in front of you.  Please keep

8  your voice up.

9      MR. RATLIFF:  May I inquire, Your Honor?

09:29:46  10      THE COURT:  Please, sir.

11                  **DAVID WAYNE BOYD,**

12  after having been first cautioned and duly sworn, testified

13  as follows:

14                  **DIRECT EXAMINATION**

09:29:47  15  BY MR. RATLIFF:

16  **Q.**   Officer Boyd, please state your full name for the

17  record.

18  **A.**   David Wayne Boyd.

19  **Q.**   And where are you employed?

09:29:53  20  **A.**   U.S. Customs and Border Protection, Bush

21  Intercontinental Airport, Houston.

22  **Q.**   And what position do you have with them?

23  **A.**   I'm a Customs and Border Protection officer.

24  **Q.**   How long have you been with Customs and Border

09:30:08  25  Protection?

*Direct-Boyd/By Mr. Ratliff*

1  **A.**   Nine years.

2  **Q.**   Sir, I direct you to June 2nd of last year.  Were you

3  part of a enforcement team screening a flight to Dubai --

4  **A.**   Yes, sir.

09:30:20   5  **Q.**   -- at Bush Airport?

6  **A.**   Yes, sir.

7  **Q.**   Did there come a time when you encountered Mr. and

8  Mrs. Jones in the screening area?

9  **A.**   Yes, sir.

09:30:30   10  **Q.**   Will you tell the Court what happened.

11  **A.**   I was at the secondary screening area where we check

12  the bags and hand-carried items that they bring on to the

13  airplane.  We're a currency team, so we check for

14  currency.

09:30:52   15  **Q.**   And did there come a time you did an inspection of

16  Mr. Jones?

17  **A.**   I inspected a jacket that Mr. Jones had in his

18  possession.

19  **Q.**   And what, if anything, did you find in that jacket?

09:31:08   20  **A.**   I found a sum of money in the inside pocket of the

21  jacket.

22  **Q.**   How large of a sum, roughly, approximately?

23  **A.**   I wouldn't know the exact amount, but it was a stack

24  of hundred dollar bills, as I didn't count the money at

09:31:29   25  that point.

*Cross-Boyd/By Mr. Barker*

1   **Q.**   Okay.  And those funds was found where, again?

2   **A.**   Inside the jacket.

3   **Q.**   Of Mr. Jones?

4   **A.**   Yes, sir.

09:31:38  5   **Q.**   And did you accompany Mr. and Mrs. Jones down to an

6   area called secondary inspection?

7   **A.**   Yes, sir.

8   **Q.**   Would you explain to the Court what secondary

9   inspection is.

09:31:50  10   **A.**   In the secondary inspection area, all hand-carried

11   and all checked luggage of a passenger are inspected for

12   contraband or any undeclared currency that might not have

13   been presented at the inspection table originally.

14          MR. RATLIFF:  No further questions, Your Honor.

09:32:24  15          THE COURT:  Mr. Barker?

16          MR. BARKER:  Very briefly, Your Honor.

17                 **CROSS-EXAMINATION**

18  BY MR. BARKER:

19   **Q.**   Officer Boyd, let me take you first to the inspection

09:32:34  20   table where you said you were primarily stationed.

21          Would you agree that Mr. Jones voluntarily

22   produced to you the currency in his possession?

23   **A.**   No, sir.

24   **Q.**   Would you agree with me that he voluntarily produced

09:32:54  25   the traveler's checks that were in his possession?

*Cross-Boyd/By Mr. Barker*

1  **A.**   Not to me, sir, he didn't present them to me.

2  **Q.**   Were the traveler's checks presented to anyone at the

3  inspection table?

4  **A.**   Officer Clark and Officer Davila were at the initial

5  table that they were at.

6  **Q.**   And where was Mr. Jones' jacket?

7  **A.**   In his possession.

8  **Q.**   At the inspection table?

9  **A.**   Yes.

10  **Q.**   And did he ever put the jacket on the table?

11  **A.**   Not to my recollection.  I never saw that they

12  belonged -- put the jacket on the table.

13  **Q.**   So it's your contention now, despite the government's

14  agreed findings, that Mr. Jones did not voluntarily

15  produce the currency in his possession?

16  **A.**   Not what was in the jacket.

17           MR. RATLIFF:  Your Honor, the government

18  objects to that conclusion of fact.  The government never

19  made that concession.

20           THE COURT:  Okay.

21           MR. BARKER:  I will reask the question.

22           THE COURT:  All right.  When you say the jacket

23  was in his possession, what does that mean?

24           THE WITNESS:  It was not laid on the inspection

25  table.  I don't really recall if he had the jacket on or if

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

*Cross-Boyd/By Mr. Barker*

1   he had it in his hand, but it was not on the inspection

2   table.

3                THE COURT:  But he was carrying it in a normal

4   way?

09:34:09   5                THE WITNESS:  As I said, Your Honor, I don't

6   remember if he was wearing it.

7                THE COURT:  He was either wearing it, slanted

8   over his shoulder or wrapping it over his arm, it was a

9   normal way?

09:34:21   10               THE WITNESS:  Yes, sir.

11               THE COURT:  He wasn't hiding it?

12               THE WITNESS:  No, sir, he wasn't hiding.

13               THE COURT:  Not that it would have been easy to

14   do.

09:34:28   15               MR. BARKER:  Thank you, Your Honor.  May we

16   move on?

17   MR. BARKER:

18   **Q.**   If I could take you now to the secondary inspection

19    room when you went after the inspection table?

09:34:36   20   **A.**   Yes, sir.

21               THE COURT:  Would that make it tertiary?

22               MR. BARKER:  I guess that would make it a

23   tertiary inspection.

24   BY MR. BARKER:

09:34:43   25   **Q.**   After that room, was there a pat down of Mr. Jones

*Cross-Boyd/By Mr. Barker*

1   performed?

2   **A.**    There was a pat down done, but I did not witness a

3   pat down.

4   **Q.**    Okay.  And are you aware, did you -- were you

09:34:52    5   involved in the inspection of the checked luggage that was

6   pulled from the airplane?

7   **A.**    Yes.

8   **Q.**    Did you find any undeclared currency or monetary

9   instruments there?

09:35:01   10   **A.**    No, sir.

11   **Q.**    Are you aware of any illegal or criminal

12   investigation, any criminal investigation of the Joneses

13   regarding the facts at issue here today?

14   **A.**    No, sir.

09:35:11   15   **Q.**    Are you aware that the funds and the currency and

16   monetary instruments they were transporting were derived

17   from any criminal or illegal source?

18   **A.**    No, sir, I would not have that knowledge.

19              MR. BARKER:  Thank you, Your Honor.

09:35:26   20              THE COURT:  Isn't that also hearsay?

21              MR. BARKER:  I don't know the answer to that.

22   I suppose it would.

23              THE COURT:  The answer is yes.

24                Mr. Ratliff?

09:35:36   25              MR. RATLIFF:  No further questions, Your Honor.

1          THE COURT:  You may step down, officer.

2          THE WITNESS:  Sure.

3          THE COURT:  Mr. Ratliff, when they're through,

4  may they go back to work?  It's up to you.

09:35:51    5          MR. RATLIFF:  They're all traveling together,

6  Your Honor, and I want to keep them available.

7          THE COURT:  Okay.

8          MR. RATLIFF:  Just in case of rebuttal.

9          THE COURT:  It's up to you.

09:35:59   10          MR. RATLIFF:  Thank you very much, Your Honor.

11          THE COURT:  Mrs. Jones, don't worry about her.

12  She makes better sense than the lawyers.

13              Good morning.  Could you sit up there and

14  speak right into the microphone, please, sir.

09:36:31   15          THE WITNESS:  Yes, sir.

16          THE COURT:  Mr. Ratliff?

17                      **RUSSELL CARMEN**,

18  after having been first cautioned and duly sworn, testified

19  as follows:

09:36:40   20                  **DIRECT EXAMINATION**

21  BY MR. RATLIFF:

22  **Q.**   Officer Carmen, please state your full name for the

23  record.

24  **A.**   Russell Carmen.

09:36:45   25  **Q.**   And where are you employed, sir?

*Direct-Carmen/By Mr. Ratliff*

1    **A.**    I'm employed with the Department of Homeland Security

2    U.S. Customs and Border Protection at George Bush

3    Intercontinental Airport.

4    **Q.**    What position do you have with them?

09:36:55    5    **A.**    I am part-time field training officer, and I'm a

6    member of the drug enforcement team.

7    **Q.**    I direct your attention to June 2nd of last year.

8    Were you part of the enforcement team that was screening a

9    flight to Dubai?

09:37:11    10    **A.**    I was, sir.

11    **Q.**    And did you have an occasion to be involved in the

12    seizure of funds from Mr. and Mrs. Jones?

13    **A.**    I was the person that verified the account in our

14    secondary.

09:37:25    15    **Q.**    And how did you verify the account?

16    **A.**    I took the money after the primary officer had

17    already counted it.  I counted it myself, wrote down my

18    numbers, after the supervisor also counted it, we compared

19    our three sheets, made sure we all had the same count.

09:37:41    20    **Q.**    Now, who did you count the money in front of?

21    **A.**    I counted it in front of the passengers.

22            THE COURT:  There's not a dispute about the

23    amount of money, is there?

24            MR. BARKER:  No, Your Honor.  We stipulate.

09:37:53    25            MR. RATLIFF:  The only thing, Your Honor, in

1  the count there was 146 one hundred bills.  That's the only

2  testimony I'm seeking to achieve.

3              THE COURT:  Well, 146?

4              MR. RATLIFF:  $100 bills.

09:38:06  5  THE COURT:  And the traveler's checks?

6              MR. RATLIFF:  There were traveler's checks,

7  there were 19 twenties, six tens, and six fives, Your

8  Honor.

9              THE COURT:  Anything else?

09:38:25  10  MR. RATLIFF:  No, Your Honor.

11             THE COURT:  Thank you.

12             MR. RATLIFF:  With that into evidence, I have

13  no further questions for this witness.

14             THE COURT:  You're good.

09:38:35  15  THE WITNESS:  Yes, sir.

16             THE COURT:  You may step down.

17             MR. RATLIFF:  Your Honor, the plaintiff rests.

18             THE COURT:  Yes, sir?

19             MR. CALLAHAN:  Your Honor, I'd like to call

09:39:08  20  Mr. Jones to the stand.

21             THE COURT:  Don't you want to make a motion?

22             MR. CALLAHAN:  I would say that a motion for

23  directed verdict, Agent Hernandez admitted that Mr. Jones

24  was asked how much currency he had on him, and Mr. Jones'

09:39:21  25  response was that he didn't know.  Agent Hernandez admitted

1  that Mr. Jones, when he answered how many dollars he had on

2  him, that he guessed 20,200.  And that Agent Hernandez

3  admitted that he told him to sign the form.

4           I would move for directed verdict on that

09:39:37   5  ground, Your Honor.

6           THE COURT:  There's 146 hundreds, that's

7  $14,600?

8           MR. RATLIFF:  I'm sorry.  Say that again, Your

9  Honor.

09:39:56   10           THE COURT:  146 hundreds is $14,600.

11           MR. RATLIFF:  Yes, Your Honor.

12           THE COURT:  20 -- 18 twenty-dollar traveler's

13  checks is $3,800; is that right?

14           MR. CALLAHAN:  My understanding is the

09:40:12   15  breakdown is that there were $20,000 in traveler's checks,

16  and a total of $15,131 in currency between the $4,000 in

17  currency that Mrs. Jones had, and then the --

18           THE COURT:  Well, he only --

19           MR. CALLAHAN:  11,000 -- I'm not sure what the

09:40:30   20  import of the 146 hundreds versus -- my understanding was

21  there were 20,000 in traveler's checks and Mrs. Jones had

22  $4,000 on her, and then the total currency Mr. Jones had

23  $11,131.

24           THE COURT:  By that --

09:40:51   25           MR. CALLAHAN:  $10,000 of that may have been

```
 1  traveler's checks.  I'm not sure.
 2              THE COURT:  Is it in proposed findings?
 3              MR. CALLAHAN:  All of this is in proposed
 4  findings of fact.
 5              MR. RATLIFF:  Yes, Your Honor.
 6              THE COURT:  I'll quit trying to do the
 7  arithmetic.
 8              MR. RATLIFF:  Your Honor, just for
 9  clarification, Ms. Jones had $4,000 in cash.  Mr. Jones had
10  $11,131.  And of that, he had approximately 106 one
11  hundred-dollar bills.
12              THE COURT:  So between the two of them, it
13  added up to that $31,000?
14              MR. RATLIFF:  Yes, Your Honor.
15              THE COURT:  That's all cash, all currency, all
16  treasury bills, all Deutsch Bank bonds?
17              MR. CALLAHAN:  35,131 was the total currency.
18  Mr. Jones had 31,131 currency in traveler's checks on him,
19  and Ms. Jones never had $10,000.  She had $4,000 on her in
20  cash.  I believe that's stipulated.
21              THE COURT:  What's the standard, Mr. Ratliff?
22              MR. RATLIFF:  By a preponderance of the
23  evidence, Your Honor.
24              THE COURT:  I know.  But, I mean, what are the
25  statutory criteria for seizing money that is -- that's
```

1 misreported?

2             MR. RATLIFF:  Seizing money that's misreported?

3             THE COURT:  Yes, sir.

4             MR. RATLIFF:  They're at the border.  They are

09:42:40  5 subject to search and seizure, and the --

6             THE COURT:  Well, I understand the search and I

7 understand seizing contraband.  This is not actually

8 contraband.

9             MR. RATLIFF:  No, Your Honor.

09:42:53 10             THE COURT:  This is just undeclared legitimate

11 property.

12             MR. RATLIFF:  That is correct, Your Honor.

13 Under Title 31 USC 5317(c)(2), it provides for the seizure

14 and forfeiture of funds involved in the violation of the

09:43:11 15 currency reporting requirements.  And the government's

16 contention is that by their not truthfully declaring the

17 full amount of money that they were transporting, they

18 violated currency reporting requirements, and under 5317,

19 the officers were entitled to seize those funds for

09:43:31 20 forfeiture.

21             THE COURT:  Didn't they report it when they

22 were asked the details?

23             MR. RATLIFF:  No, Your Honor.  My position is

24 that at no time did they report the full amount of money

09:43:46 25 that they were carrying.  Mr. Jones only reported that he

1  was carrying $20,200.  It was on a statement, that if I can

2  point out on, Plaintiff's Exhibit Number 1.

3              THE COURT:  I understand he said $20,200 in

4  cash.

09:44:07  5              MR. RATLIFF:  Yes, Your Honor.

6              THE COURT:  How much cash did he have?

7              MR. RATLIFF:  In fact, he had -- he had

8  approximately $11,131 in cash.  He had $20,000 in American

9  Express traveler's checks.  In total cash and traveler's

09:44:41  10  checks, he had approximately $31,000 on him.  And he only

11  told the officers that he had $20,200.

12              THE COURT:  Of currency?

13              MR. RATLIFF:  Of currency.  And that's

14  incorrect, because he didn't have that much in currency.

09:44:58  15  He had that much in American Express checks.  He at no time

16  fully reported the funds that he was carrying in total,

17  attempting to carry in total out of the United States,

18  that's $31,000, Your Honor.  And when he was -- I'm sorry,

19  Your Honor.

09:45:33  20              THE COURT:  No.  Go ahead.

21              MR. RATLIFF:  That's it, Your Honor.

22              THE COURT:  So what he didn't declare was

23  roughly $15,000?

24              MR. RATLIFF:  Yes, Your Honor.

09:45:50  25              MR. CALLAHAN:  Your Honor, one point, since we

*Direct-Kyle Jones/By Mr. Callahan*

1  are making distinction between dollars and traveler's

2  checks.  At that point he didn't declare $15,000.

3                THE COURT:  Speak up.

4                MR. CALLAHAN:  He didn't declare the $20,000 in

09:46:03   5  monetary instruments and the traveler's checks.  I was just

6  trying to clear that up.  You seem to focus on that,

7  because that's what he was being asked about on the jet

8  way.  So he didn't know to report the $20,000 in traveler's

9  checks.

09:46:22  10                THE COURT:  I just want to get the components

11  straight.  Since we're all here, I'll go ahead and hear it.

12  I'll carry your motion.

13                MR. CALLAHAN:  Your Honor, I'd like to call

14  Mr. Jones.

09:47:40  15                        **KYLE DANIEL JONES**,

16  after having been first cautioned and duly sworn, testified

17  as follows:

18                        **DIRECT EXAMINATION**

19  BY MR. CALLAHAN:

09:48:01  20  **Q.**   Mr. Jones, if you would, state your name for the

21   record.

22  **A.**   Kyle Daniel Jones.

23                THE COURT:  Pull that microphone closer to you.

24  BY MR. CALLAHAN:

09:48:13  25  **Q.**   Mr. Jones, let's begin with a little bit of

*Direct-Kyle Jones/By Mr. Callahan*

1    background.  Why were you and your family at George Bush

2    Intercontinental Airport on June 2nd, 2011?

3    **A.**   We was going on vacation out to Ethiopia.

4    **Q.**   And how long had you been planning your trip?

09:48:27    5    **A.**   Two years.

6    **Q.**   And why so?

7    **A.**   Because we had -- just had a new born baby and we

8    were going to go out there after the baby makes two so she

9    could have all of her shots and all that.  She couldn't

09:48:42    10    travel before then.

11    **Q.**   And how long was your trip to Ethiopia going to last

12    that summer?

13    **A.**   Two months.

14    **Q.**   Let's shift topics a little bit and talk about your

09:48:52    15    awareness of any currency reporting requirements before

16    your trip.  Okay?

17    **A.**   Okay.

18    **Q.**   Now, had you ever filled out a currency reporting

19    form in prior trips?

09:49:01    20    **A.**   No, I haven't.

21    **Q.**   Before the trip at issue here, had you ever been

22    asked by a Customs agent while traveling, whether you were

23    carrying more than $10,000?

24    **A.**   No, I hadn't.

09:49:11    25    **Q.**   Had you ever carried more than $10,000 while

*Direct-Kyle Jones/By Mr. Callahan*

1    traveling overseas before?

2    **A.**    No, I hadn't.

3    **Q.**    Let's -- actually if I could borrow this.  I think

4    you saw Mr. Ratliff reference this poster at the airport.

09:49:27    5    Did you see him reference that?

6    **A.**    No, I never saw that sign.

7    **Q.**    Did you ever see this poster at the airport that

8    day?

9    **A.**    No, I didn't.

09:49:34    10            MR. CALLAHAN:  Just for the record, we're

11    referencing what we previously called Plaintiff's

12    Exhibit 1.

13    BY MR. CALLAHAN:

14    **Q.**    Now, let's talk a little bit about why you were

09:49:47    15    bringing these funds on your trip.

16            First, how would you characterize the

17    ability to use credit cards in Ethiopia?

18    **A.**    Nearly impossible.

19    **Q.**    And why do you say that?

09:49:58    20    **A.**    Because they don't use credit cards.  There's only

21    one place I know of that uses credit cards in Ethiopia,

22    and that's the Sheraton Hotel.

23    **Q.**    Now, with respect to the currency and the traveler's

24    checks that you brought, what were the main focus, what

09:50:14    25    were the main things you expected to spend the funds on?

*Direct-Kyle Jones/By Mr. Callahan*

1  **A.**   Well, the traveler's checks were used for emergency,

2  like hospital for my daughter, myself and my wife, and the

3  money was for a wedding celebration that we were going to

4  have.  And also rental property, the housing, daily

09:50:38    5  living, and also birthday -- second birthday party for my

6  daughter.

7  **Q.**   Now, you mentioned concerns about the possibility of

8  medical emergencies and you mentioned your daughter's

9  immunizations?

09:50:53    10             THE COURT:  Yes, he did.  Don't repeat answers

11  that you already have.

12  BY MR. CALLAHAN:

13  **Q.**   What were your concerns about the possibility of

14  medical emergencies that made you want to bring that

09:51:05    15  amount of emergency funds?

16             THE COURT:  Have you ever gone to Africa?

17             MR. CALLAHAN:  Just the Middle East, Your

18  Honor.

19             THE COURT:  Okay.  They give you about nine

09:51:15    20  pages of shots to get, things to do, precautions to take,

21  and if you did all of them, you would need 12 bearers to

22  carry all your medical equipment and luggage.

23             MR. CALLAHAN:  I understand, Your Honor.

24             THE COURT:  And I'd do the same thing if I was

09:51:30    25  going to Detroit.

1              MR. CALLAHAN:  Fair enough.

2   BY MR. CALLAHAN:

3   **Q.**   And you were concerned about malaria and yellow

4   fever?

09:51:38  5   **A.**   And food poisoning.

6              THE COURT:  And cholera and diarrhea?

7              THE WITNESS:  Yes.

8   BY MR. CALLAHAN:

9   **Q.**   And was it anticipated that all the funds you were

09:51:43  10  bringing would be spent on your trip?

11  **A.**   No.  The emergency funds were supposed to come back

12  if there was no emergency.

13  **Q.**   Now, let's talk about where the funds that were

14  ultimately seized by the government came from.  Where did

09:51:56  15  those funds come from?  How were they generated?

16  **A.**   They came from my savings, from our jobs.

17  **Q.**   And what is your job, Mr. Jones?

18  **A.**   I work for We Care Homes Incorporated, which we take

19  care of the mentally challenged, the handicapped,

09:52:12  20  homebound, and elderly.

21  **Q.**   Now, once the government seized your funds before

22  your trip, did you have to get replacement funds?

23  **A.**   Yes, I did.

24  **Q.**   And where did those replacement funds come from?

09:52:25  25  **A.**   From my savings.

*Direct-Kyle Jones/By Mr. Callahan*

1  **Q.**   After the government seized your family's funds, did
2  you make that day's flight?
3  **A.**   No, I didn't.
4  **Q.**   How much did it cost to change your family's flight
5  that day?
6  **A.**   Approximately --
7              MR. RATLIFF:  Objection, Your Honor.
8  Irrelevant.
9              THE COURT:  Overruled.
10             THE WITNESS:  Approximately $1,500.
11 BY MR. CALLAHAN:
12 **Q.**   And did you have to procure a lodging for the night?
13 **A.**   Yes, I did.  A hotel room.
14 **Q.**   And about --
15 **A.**   And food.
16 **Q.**   About how much do you think the cost associated
17 with --
18             THE COURT:  Even so, the record is clear,
19 unless you have exhibits.  He's from Louisiana.  Actually,
20 you get shots to go to Louisiana too.
21             MR. CALLAHAN:  Probably true.  Probably true.
22 BY MR. CALLAHAN:
23 **Q.**   Mr. Jones, you were traveling to Houston from where?
24 **A.**   From Breaux Bridge, Louisiana.
25 **Q.**   So you needed -- because you missed your flight over

*Direct-Kyle Jones/By Mr. Callahan*

1   night, you needed to procure a hotel room for your family?

2   **A.**   Yes.

3           THE COURT:  He couldn't afford to live in

4   Breaux Bridge, Louisiana.

09:53:21   5   BY MR. CALLAHAN:

6   **Q.**   Mr. Jones, let's actually move -- we heard the

7   government talk a little bit about your interaction with

8   Agent Hernandez.  Let's move to that.

9           Where were you when Agent Hernandez first

09:53:31   10   addressed you?

11   **A.**   In -- about to board the plane.

12   **Q.**   And what did Agent Hernandez ask you first?

13   **A.**   He said, "Can you step this way, please?"

14   **Q.**   And then where were Mrs. Jones and your daughter at

09:53:45   15   this time?

16   **A.**   They were close to the door that led to the back.

17   **Q.**   And what was Mrs. Jones doing?

18   **A.**   She was attending to our daughter.

19   **Q.**   Similar to what she's doing now?

09:53:58   20   **A.**   To Soleanna.

21   **Q.**   Your daughter Soleanna is how old?

22   **A.**   Yes.

23           THE COURT:  Two years?

24           THE WITNESS:  She was just two months shy of

09:54:07   25   two years when we went to Ethiopia.  We were going to

*Direct-Kyle Jones/By Mr. Callahan*

1  Ethiopia.

2  BY MR. CALLAHAN:

3  **Q.**    And your wife was minding your daughter during this

4  time?

09:54:17  5  **A.**    Yes.

6  **Q.**    Now, did Agent Hernandez address your wife?

7  **A.**    No, he didn't.

8  **Q.**    Did Mrs. Jones address Agent Hernandez during this

9  interaction?

09:54:25  10  **A.**    No.

11               THE COURT:  By "address," you mean talk to?

12               MR. CALLAHAN:  I'm sorry, Your Honor?

13               THE COURT:  By "address" do you mean talk to?

14               MR. CALLAHAN:  Yes.  Did she talk to Agent

09:54:31  15  Hernandez.

16               THE COURT:  Talk in a normal way.

17               THE WITNESS:  No, she didn't.

18  BY MR. CALLAHAN:

19  **Q.**    Now, so Agent Hernandez addressed you to walk toward

09:54:42  20  him; correct?

21  **A.**    Yes.

22  **Q.**    Okay.  Then what did he ask you?

23  **A.**    He asked me, "How much U.S. currency are you

24  carrying?"

09:54:50  25  **Q.**    And what did you say?

*Direct-Kyle Jones/By Mr. Callahan*

1    **A.**   I said I didn't know.

2    **Q.**   And then what did he ask you?

3    **A.**   He said, "You mean to tell me you don't know how much

4    U.S. currency you have?"

09:55:01   5    **Q.**   And what was your response?

6    **A.**   And I said I didn't know.

7    **Q.**   And then after that, what did he ask you?

8    **A.**   He said, "How many dollars do you have?"

9    **Q.**   And what did you say in response, Mr. Jones?

09:55:12   10   **A.**   I said, "Maybe 20,200."

11   **Q.**   And what did Agent Hernandez do after that?

12   **A.**   He put the 20,200 on the sheet of paper, and he said,

13   "Sign here."

14   **Q.**   Was the rest of the form blank, or was it filled out?

09:55:31   15   **A.**   It was blank.

16   **Q.**   Now, what did your wife do, if anything, to verify

17   to Agent Hernandez that the 20,200 amount on the form was

18   correct?

19   **A.**   She didn't do anything.

09:55:40   20   **Q.**   Now, at this -- in this interaction with Officer

21   Hernandez --

22            THE COURT:  Conversation.  Not "interaction."

23            MR. CALLAHAN:  Sure.

24   BY MR. CALLAHAN:

09:55:51   25   **Q.**   In the conversation with --

*Direct-Kyle Jones/By Mr. Callahan*

1          THE COURT:  You're not a patent lawyer.

2          MR. CALLAHAN:  Fortunately for all of us;

3 right?

4          THE COURT:  You need to speak English.

09:55:58  5 BY MR. CALLAHAN:

6   **Q.**   In this conversation that you were having with

7 Officer Hernandez, did he explain that you needed to be

8 accurate on the form?

9   **A.**   No, he didn't.

09:56:05  10  **Q.**   What was Agent Hernandez' explanation of the

11 difference between monetary instruments and currency or

12 dollars?

13  **A.**   One didn't come up.

14  **Q.**   Did Agent Hernandez mention monetary instruments, to

09:56:18  15 your memory?

16  **A.**   No, he didn't.

17  **Q.**   Did Agent Hernandez mention traveler's checks?

18  **A.**   No, he didn't.

19  **Q.**   Did you ask Agent Hernandez if you and your wife

09:56:25  20 could count all the dollars that you-all had?

21  **A.**   No, I didn't.

22  **Q.**   Why didn't you?

23  **A.**   I didn't know I could.

24  **Q.**   What was Agent Hernandez' demeanor during your

09:56:35  25 conversation?

*Direct-Kyle Jones/By Mr. Callahan*

1  **A.**   I feel he was kind of short, impatient.

2  **Q.**   Now, did you read the FinCen 105 form before you

3  signed it?

4  **A.**   No, I didn't.

09:56:49  5  **Q.**   Why not?

6  **A.**   Because the police officer told me to sign and I

7  signed.  And I thought that would be the end of it.

8  **Q.**   Well, let's look, you have a folder in front of you

9  and if you'd turn to Plaintiff's Exhibit 1.

09:57:11  10              Now, if you look on the area of that form,

11  right above your signature.

12              THE COURT:  I've read it.

13  BY MR. CALLAHAN:

14  **Q.**   And Mr. Jones --

09:57:21  15              THE COURT:  It says what it says.

16              MR. CALLAHAN:  Good enough.

17  BY MR. CALLAHAN:

18  **Q.**   Now, before you had filled out this form or before

19  Agent Hernandez had filled out "20,200," what were your

09:57:43  20  conversations, if any, with Mrs. Jones, about how much

21  money she was carrying?

22  **A.**   None.

23  **Q.**   Do you know how much money she was carrying?

24  **A.**   No, I didn't.

09:57:50  25  **Q.**   Now, when you provided the information to Agent

*Direct-Kyle Jones/By Mr. Callahan*

1  Hernandez, did you intend to count the traveler's checks

2  you were carrying in your estimate?

3  **A.**   No.

4  **Q.**   Why not?

09:58:00  5  **A.**   He asked if they were U.S. dollars.  I didn't

6  perceive that traveler's checks was U.S. dollars.

7  **Q.**   Mr. Jones, did you intend to evade the currency

8  reporting requirements?

9  **A.**   No.

09:58:17  10  **Q.**   Now, what was the next step, after Agent Hernandez

11  had directed you to sign the form, what then?

12  **A.**   He told me to get in the line and go to the table.

13  **Q.**   How long did your conversation with Agent Hernandez

14  last?

09:58:28  15  **A.**   Two minutes.

16  **Q.**   Now, you're in line at the inspection line.  What

17  were you thinking at this time?

18  **A.**   I was figuring, what's going on here, you know?  I

19  didn't understand.

09:58:44  20  **Q.**   What happened when you got to the head of the line?

21  **A.**   When I got to the table?

22  **Q.**   Yes.

23  **A.**   Oh, when I got to the table, the guy asked me, he

24  said, "Put all your money, your currency, your checks,

09:58:57  25  your traveler's checks, all currency on the table."

*Direct-Kyle Jones/By Mr. Callahan*

1  **Q.**   Was that the first time that any agent had mentioned

2  traveler's checks?

3  **A.**   Yes.

4  **Q.**   And what did you -- what did you do at that point?

09:59:10  5  **A.**   I began to go through the bags, through the carryon,

6  which was about six or seven carryons, to pull out

7  anything that I had in currency, in dollars and traveler's

8  checks.

9  **Q.**   What was your wife doing at this time?

09:59:26  10  **A.**   She was -- really, Soleanna wasn't cooperating

11  whatsoever, so she was handling her and she was also

12  trying to get her wallet out of her purse.

13  **Q.**   After you had placed -- did you place all of your

14  currency and your traveler's checks on the inspection

09:59:48  15  table at that time?

16  **A.**   Yes, I did.

17  **Q.**   What happened after you left the inspection table?

18  **A.**   We went to -- through the airport to another room

19  where we were searched.

10:00:04  20  **Q.**   Is this where they conducted the pat down searches?

21  **A.**   Yes.

22  **Q.**   Did the pat down searches discover any more currency

23  or traveler's checks?

24  **A.**   No, it didn't.

10:00:15  25  **Q.**   Now, were you interviewed about your trip and the

*Direct-Kyle Jones/By Mr. Callahan*

1  seized funds by a Homeland security agent at that time?

2  **A.**   Yes.

3  **Q.**   And what did you tell her -- what did you tell the

4  officer or agent that interviewed you, you were going to

10:00:33  5  do with your money when in Ethiopia?

6  **A.**   The same thing that I said, about the wedding

7  celebration, the birthday, the emergency funds and the

8  rental housing, and car.

9  **Q.**   Mr. Jones, if you would quickly, let's look at

10:00:48  10  Plaintiff's or Claimant's Exhibit 2 -- Plaintiff's

11  Exhibit 2.

12           MR. CALLAHAN:  And, Your Honor, I know you have

13  a booklet up there.

14  BY MR. CALLAHAN:

10:00:59  15  **Q.**   What is this first picture of?

16  **A.**   This is my daughter's birthday party.

17  **Q.**   Is this one of the things that you had spent the

18  replacement funds on after the government took them?

19  **A.**   Yes, yes.

10:01:11  20  **Q.**   Let's look at the third picture.  What does this

21  picture show?

22  **A.**   This is part of the guests that's underneath tents.

23  **Q.**   And who are the guests, primarily?

24  **A.**   Extended family and friends.

10:01:31  25  **Q.**   And about how many people came to the party?

*Direct-Kyle Jones/By Mr. Callahan*

1  **A.**  Approximately 75.

2  **Q.**  Now, let's go actually to the last picture.  I won't

3  ask you about the picture you dancing with your wife, but

4  you might be under oath about who was the best dancer.

10:01:50  5  **A.**  I'm not much of a good dancer, especially the Arab

6  dancing.

7          THE COURT:  The last picture is the daughter?

8          MR. CALLAHAN:  Last picture is the daughter.

9  BY MR. CALLAHAN:

10:01:54  10  **Q.**  If you'd look at that for a minute, Mr. Jones.  Where

11  is your daughter in this picture?

12  **A.**  Oh, my daughter is in one of the rent houses -- one

13  of the rent houses we rented in Ethiopia.

14  **Q.**  Did you have to buy appliances for that house?

10:02:09  15  **A.**  Yes.  A few appliances.

16  **Q.**  About how much did you have to spend on this wedding

17  celebration and birthday party for about 75 guests in

18  Ethiopia?

19  **A.**  Approximately 5- to $7,000.

10:02:24  20  **Q.**  About how much did you spend renting the house?

21  **A.**  About 3,000.

22          MR. CALLAHAN:  That's all the questions I have

23  for Mr. Jones.  Thank you.

24

25

*Cross-Kyle Jones/By Mr. Ratliff*

1                    **CROSS-EXAMINATION**

2  BY MR. RATLIFF:

3    **Q.**   Mr. Jones, my name is Albert Ratliff.  I'm going to

4  ask you some questions.  If you don't understand the

10:02:46   5  questions, let me know and I'll try to rephrase it.

6                    Is it correct that you said that when you

7  were at the verification table, you placed all of the

8  cash, currency, traveler's checks, and everything on the

9  table?

10:03:01  10  **A.**   Yes, I did.

11   **Q.**   Did you place the money that you had on your

12  jacket -- in your jacket pocket on the table?

13   **A.**   Yes, I did.

14   **Q.**   You placed that money -- you took it out of your

10:03:13  15  pocket?

16   **A.**   I took it out of my jacket pocket and placed it on

17  the table.

18   **Q.**   And your testimony is that Plaintiff's Exhibit

19  Number 1, you didn't read that?

10:03:26  20  **A.**   No, sir.

21   **Q.**   And it's about 17 feet from where Officer Hernandez

22  had a conversation with you to the inspection table, and

23  during that time, you didn't think that it was important

24  for you to look at what you just signed?

10:03:46  25  **A.**   I didn't have that.

*Cross-Kyle Jones/By Mr. Ratliff*

1  **Q.**   You didn't have this?

2  **A.**   No, he brought that to the table.

3  **Q.**   He brought this to the table?

4  **A.**   Yes.

10:03:53  5  **Q.**   Okay.  And when you got to the table, did you ever

6  tell them that I do have more than $20,200 on me in cash

7  and traveler's checks?

8  **A.**   No, I didn't.

9  **Q.**   You never told him that?

10:04:11  10  **A.**   No.

11  **Q.**   Did you ever tell anybody that you had more than

12  $20,200 in cash and traveler's checks on you?

13  **A.**   No, I didn't.

14  **Q.**   When you were at that airport, you knew how much

10:04:25  15  money you had; is that correct?

16  **A.**   No, I didn't.

17  **Q.**   Did you know you had $10,000 in cash?

18  **A.**   No, I didn't.

19  **Q.**   I think you said that you never carried more than

10:04:37  20  $10,000 in cash out of the country?

21  **A.**   That's correct.

22  **Q.**   So in this one occasion were you, in fact, carrying

23  $10,000 in cash out of the country, you were not aware

24  that you had that amount of money on you?

10:04:49  25  **A.**   I wouldn't -- wasn't aware of the exact amount of

*Cross-Kyle Jones/By Mr. Ratliff*

1   money I was carrying.

2   **Q.**   How much money did you think you were carrying in

3   cash?

4   **A.**   My guesstimation was what I told the officer.

10:05:00   5   **Q.**   So even though they found over $30,000 on you, at

6   that time, you thought you only had $20,200 on you?

7   **A.**   I was counting --

8            MR. CALLAHAN:  Objection to the question.  They

9   didn't find 35,000 in dollars on him.

10:05:16   10           THE COURT:  Wait a minute.

11           MR. CALLAHAN:  I'm sorry, Your Honor.

12           THE COURT:  There's that's a common theme here.

13   Let him ask his questions.

14           MR. CALLAHAN:  Yes, Your Honor.

10:05:27   15   BY MR. RATLIFF:

16   **Q.**   Sir, I'll rephrase the question.

17   **A.**   Okay.

18   **Q.**   In total funds that you had in traveler's checks, in

19   cash, you were carrying more than $31,000?

10:05:40   20   **A.**   Yes.

21   **Q.**   In value?

22   **A.**   Yes.

23   **Q.**   And when up indicated that you only had $20,200, you

24   had forgotten about the additional $10,000?

10:05:53   25   **A.**   No.  They asked me how much U.S. currency I had, how

*Cross-Kyle Jones/By Mr. Ratliff*

1   many dollars I had, and my guesstimation was the dollars,

2   not the traveler's checks.

3   **Q.**   Okay.  And when you got to the verification table,

4   and you said that they asked you about traveler's checks,

10:06:11   5   monetary instruments?

6   **A.**   Yes.

7   **Q.**   Everything.  And how much money did you tell them

8   that you had at that time?

9   **A.**   They didn't ask me how much money I had at that time.

10:06:20   10   **Q.**   Okay.  Did Officer Hernandez explain to you your

11   obligation to report the currency and monetary instruments

12   that you had taken out of the country?

13   **A.**   No, he didn't.

14   **Q.**   At any time did you -- did you correct the amount of

10:06:59   15   money -- the amount of currency and coins that was written

16   on Plaintiff's Exhibit Number 1?

17   **A.**   No, I didn't.

18   **Q.**   Sir, is it your explanation that when you told

19   Officer Hernandez you were carrying $20,200 in cash, that

10:07:54   20   you were just making a guess?

21   **A.**   Yes.

22   **Q.**   Did you take Officer Hernandez' question seriously?

23   **A.**   Excuse me?

24   **Q.**   When he asked you that question, a law enforcement

10:08:11   25   officer in uniform, did you feel compelled to tell him the

*Cross-Kyle Jones/By Mr. Ratliff*

1   truth?

2   **A.**   Of course.

3   **Q.**   Then why did you guess?

4   **A.**   That was my only way of answering the question.

10:08:26   5   **Q.**   Could you have counted your money?

6   **A.**   I didn't think of asking him to count it before he --

7   the way he approached me, it was like he needed to know

8   now and he needed to know the exact amount.

9   **Q.**   Sir, after the money was seized, did you file a

10:08:59   10   petition for applying penalties of forfeiture in attempt

11   to get your money back?

12   **A.**   Yes, I did.

13         MR. RATLIFF:  May I approach the witness?

14         THE COURT:  Yes, sir.

10:09:19   15 BY MR. RATLIFF:

16   **Q.**   Sir, I show you what's been marked as Plaintiff's

17   Exhibit Number 1.  Will you take a moment and look at

18   that.

19         MR. CALLAHAN:  Just for clarity of the record,

10:09:51   20 did you call Plaintiff's Exhibit 1 --

21         MR. RATLIFF:  I'm very sorry.  Sir, can I have

22 just a moment?  It's Plaintiff's Exhibit Number 3.

23         THE COURT:  It's the complaint, isn't it, or

24 answer?

10:10:06   25         MR. CALLAHAN:  Is this a rebuttal exhibit or

1 something?

2                    MR. RATLIFF:  Yes.

3                    THE COURT:  It's part of the record; right?

4                    MR. RATLIFF:  No, Your Honor.

10:10:11  5                    MR. CALLAHAN:  It's not on his exhibit list.

6                    MR. RATLIFF:  No, Your Honor.  It's rebuttal.

7 May I?

8                    THE COURT:  It wasn't filed in this case?

9                    MR. CALLAHAN:  It was filed as an

10:10:22  10 administrative matter to the Customs agent.  They have a

11 process by which they say they return people's money, but

12 they didn't return it in this case, which then led to the

13 civil forfeiture case to be brought.  This document was not

14 on the government's exhibit list.

10:10:36  15 BY MR. RATLIFF:

16   Q.   Do you recognize that document, sir?

17   A.   Yes.

18   Q.   Sir, I direct you to the second page of that document

19   at the very bottom.  Is that your name and signature on

10:11:11  20   the documents?

21   A.   Yes, it is.

22   Q.   And let's -- all right.  I direct you to the sixth

23   page.  Do you see Paragraph E there?

24                    THE COURT:  Paragraph D?

10:11:59  25                    MR. RATLIFF:  E, Your Honor, I'm sorry.

*Cross-Kyle Jones/By Mr. Ratliff*

1           THE WITNESS:  Okay.

2  BY MR. RATLIFF:

3   Q.   Now, sir, what was told to fines, penalties and

4  forfeiture, in that petition as to the reason why you did

10:12:34  5  not tell the officers about all of the currency, monetary

6  instruments and traveler's checks that you had on you?

7   A.   Excuse me, I didn't understand the question.

8   Q.   Okay.  Let me ask you this question.  In this

9  petition, was it your explanation that claimant Kyle Jones

10:12:54  10  is an Air Force veteran --

11           THE COURT:  I've read it.

12           MR. RATLIFF:  Yes.

13  BY MR. RATLIFF:

14   Q.   Is Paragraph E the explanation that was given to

10:13:05  15  fines, penalties and forfeiture, as to the reason why you

16  didn't fully report to the officers?

17   A.   No, it wasn't.

18   Q.   Is this your statement?

19   A.   Yes.

10:13:13  20           MR. RATLIFF:  Your Honor, I move into evidence

21  Plaintiff's Exhibit 3.

22           THE COURT:  Can we just take that page, or do

23  we need the whole thing -- you want the whole thing?

24

25

*Redirect-Kyle Jones/By Mr. Callahan*

1          MR. RATLIFF:  It doesn't have to be the whole

2 thing, Your Honor.

3 BY MR. RATLIFF:

4  **Q.**   Just to make it clear on the record, Exhibit --

10:13:58  5 Plaintiff's Exhibit Number 3, is what's in Paragraph E,

6 the statement that you submitted to fines, penalties and

7 forfeiture, as part of the petition of admission?

8 **A.**   Okay.

9          MR. RATLIFF:  Thank you very much.  Your Honor,

10:14:09  10 I move this into evidence.

11          THE COURT:  It's admitted.

12          MR. RATLIFF:  Do you want to read it?

13          MR. CALLAHAN:  No, that's all right.

14          MR. RATLIFF:  No further questions, Your Honor.

10:14:33  15          MR. CALLAHAN:  Your Honor, I would move, we can

16 put in the full statement for completeness if you want to

17 read the rest of it.

18                    **REDIRECT EXAMINATION**

19 BY MR. CALLAHAN:

10:14:41  20  **Q.**   Mr. Jones, I just want to ask you a couple of

21  questions.

22          THE COURT:  You put it in there.  You really

23 want me to read all of it?

24          MR. CALLAHAN:  No.

10:14:47  25          THE COURT:  Okay.

1            MR. CALLAHAN:  I'll withdraw.

2  BY MR. CALLAHAN:

3  Q.    Mr. Jones, your attorney submitted the prior exhibit

4  that Mr. Ratliff was talking about; correct?

10:15:00  5  A.    Correct, I was still in Ethiopia.

6  Q.    You were in Ethiopia when was this submitted;

7  correct?

8  A.    That's correct.

9  Q.    And you are an Air Force veteran?

10:15:09  10  A.    Yes, I am.

11  Q.    And describe the kind of training that you had

12  received that Mr. Ratliff was mentioning?

13  A.    With the statement?

14  Q.    No.  Just describe the training that you had received

10:15:17  15  that it referenced.

16  A.    Okay.  We were trained that when you're traveling to

17  foreign countries, do not reveal the money that you are

18  carrying because a lot of foreign countries will take your

19  money and just -- you can't do anything about it.

10:15:35  20            THE COURT:  And now you've learned the United

21  States will do it, too.

22            THE WITNESS:  That, I didn't know about.

23  BY MR. CALLAHAN:

24  Q.    Now, was -- was this thought about the Air Force,

10:15:47  25  that was not part of your thought process at the time you

1   were dealing with Agent Hernandez?

2   **A.**   No.   I'm in the United States.

3                     MR. CALLAHAN:   Thank you.   No further

4   questions, Your Honor.

10:15:57   5                     MR. RATLIFF:   No questions, Your Honor.

6                     THE COURT:   You may step down.   Call your next

7   witness, please.

8                     MR. CALLAHAN:   I'd like to call Mrs. Berekti

9   Jones.

10:16:14   10                     THE COURT:   Why don't we take a 15-minute

11   recess.

12                     **(Recessed at 10:16 a.m.)**

13                     THE COURT:   Thank you.   Please be seated.

14                     Did you have something additional.

10:36:35   15                     MR. CALLAHAN:   I'd like to call Mrs. Berekti

16   Jones.

17                     THE COURT:   All right.   Would you step up here,

18   please, ma'am.

19                     That's where I want to sit.

10:36:47   20                     MR. CALLAHAN:   Make sure you speak right into

21   that so we can hear you.

22

23

24

25

*Direct-Berekti Jones/By Mr. Callahan*

1                          **BEREKTI JONES,**

2  after having been first cautioned and duly sworn, testified

3  as follows:

4                        **DIRECT EXAMINATION**

10:37:00  5  BY MR. CALLAHAN:

6     **Q.**   Mrs. Jones, if you would say your name for the

7     record, please.

8     **A.**   Berekti Jones.

9               THE COURT:  Mrs. Jones.

10:37:15  10               THE WITNESS:  Berekti Jones.

11  BY MR. CALLAHAN:

12    **Q.**   Mrs. Jones, where were you are born?

13    **A.**   Ethiopia.

14    **Q.**   Is English your first language?

10:37:24  15    **A.**   No.

16    **Q.**   What language is your first language?

17    **A.**   Amharic.

18    **Q.**   Would you spell that for the reporter?

19    **A.**   A-M-H-A-R-I-C.

10:37:33  20    **Q.**   Mrs. Jones, if you don't understand my questions, or

21    those of someone else here, please let us know.  Okay?

22    **A.**   Okay.

23    **Q.**   Let's talk quickly about --

24               THE COURT:  When were you born?

10:37:43  25               THE WITNESS:  1978.

*Direct-Berekti Jones/By Mr. Callahan*

1          THE COURT:  Just in time for the revolution?

2          THE WITNESS:  Yes.

3  BY MR. CALLAHAN:

4  **Q.**   Let's talk about that day on June 2nd, 2011, the day

10:37:58  5  of your trip.  Okay?

6  **A.**   Okay.

7  **Q.**   On June 2nd, 2011, were you, Mrs. Jones, carrying

8  more than $10,000 in currency?

9  **A.**   No.

10:38:06  10  **Q.**   Did you discuss with Mr. Jones how much currency that

11  you were carrying on that day?

12  **A.**   No.

13  **Q.**   To your knowledge, was Mr. Jones aware how much

14  currency you were carrying that day?

10:38:16  15          MR. RATLIFF:  Objection, Your Honor.

16          THE WITNESS:  No.

17          THE COURT:  Sustained.  You can refer to him as

18  her husband.

19  BY MR. CALLAHAN:

10:38:25  20  **Q.**   What was your knowledge, if any, about what

21  Mr. Jones, your husband, knew about how much currency you

22  were carrying that day?

23  **A.**   None.

24  **Q.**   Now, did you know how much currency or traveler's

10:38:38  25  checks that your husband was carrying that day?

*Direct-Berekti Jones/By Mr. Callahan*

1  **A.**   No.

2  **Q.**   The money, the $4,000 in cash, that you had on you,

3  where did that money come from?  How was it generated?

4  **A.**   From my job.

10:38:52   5  **Q.**   And what do you do?

6  **A.**   I work at We Care Homes Incorporated.  I take care of

7  elderly, mentally challenged, handicapped.

8  **Q.**   Let's move to the conversation that Mr. Jones had

9  with Agent Hernandez in the jet way.

10:39:13   10           Did you talk to Agent Hernandez in the jet

11 way?

12 **A.**   No.

13 **Q.**   What were you doing while Agent Hernandez and your

14 husband were talking?

10:39:22   15 **A.**   I was holding my baby.  I was attending her.

16 **Q.**   Did you confirm to Agent Hernandez that you and your

17 husband were carrying $20,200 in currency?

18 **A.**   No, I don't remember that.

19 **Q.**   Mrs. Jones, did you have any intent to evade the

10:39:45   20 currency recording requirements?

21 **A.**   No, I didn't know there was a requirement.

22 **Q.**   Let's move to the inspection table, Mrs. Jones.  Did

23 you cooperate at the inspection table and voluntarily

24 provide your wallet to the agents that were conducting the

10:40:01   25 inspection?

*Direct-Berekti Jones/By Mr. Callahan*

1  **A.**   Yes, I did.

2  **Q.**   Now, one of the other officers that was up here, his

3  name was Officer Boyd.  Do you remember him with the

4  moustache?

10:40:08  5  **A.**   Yes.

6  **Q.**   Did he have that same moustache back on June 2nd,

7  2011?

8  **A.**   Yes.

9  **Q.**   Now, Officer Boyd said that he took out $10,000 out

10:40:19  10  of your husband's jacket.  Did Officer Boyd do that?

11  **A.**   That's incorrect, no.

12  **Q.**   Did Officer Boyd ever speak to you?

13  **A.**   No.

14  **Q.**   Where was Officer Boyd while you were at the

10:40:33  15  inspection table?

16  **A.**   There was a second -- another table next to where we

17  were at and he was attending it.

18        THE COURT:  Wait a minute.  You're going to

19  have to speak up, please, ma'am.

10:40:42  20        THE WITNESS:  Yes.  There was another table on

21  the side, and he was searching or counting money, for other

22  traveler's.  He was attending other traveler's.

23  BY MR. CALLAHAN:

24  **Q.**   Okay.  Let's leave the airport and talk about your

10:40:58  25  family today.  There's a notebook in front of you, and if

*Direct-Berekti Jones/By Mr. Callahan*

```
 1  you turn to Plaintiff's Exhibit 3.  Do you see that
 2  letter?
 3  A.   Yes.
 4  Q.   What is it?
 5  A.   That's my acceptance letter to University of
 6  Louisiana.
 7  Q.   And when would you start attending classes there,
 8  University of Louisiana Lafayette?
 9  A.   Hopefully this summer or the fall.
10  Q.   And what do you want to study?
11  A.   Sociology, so I can be a social worker.
12  Q.   And how much do you expect tuition cost to be next
13  year?
14            THE COURT:  Counsel, everybody has lives.
15            MR. CALLAHAN:  Sure.
16            THE COURT:  And I don't believe -- I mean, I'd
17  like to get to know the Joneses, especially the littlest
18  one, but I don't need that.
19            MR. CALLAHAN:  Sure.
20            THE COURT:  We've got things -- very important
21  currency disclosure problems.
22            MR. CALLAHAN:  Sure.
23            THE COURT:  I'm even assuming you're a nice
24  person.
25            MR. CALLAHAN:  With the Judge's comments, I
```

Time stamps:
10:41:09 (line 5)
10:41:22 (line 10)
10:41:35 (line 15)
10:41:49 (line 20)
10:42:00 (line 25)

*Cross-Berekti Jones/By Mr. Ratliff*

1  don't have any further questions.

2           THE COURT:  Mr. Ratliff?

3                        **CROSS-EXAMINATION**

4  BY MR. RATLIFF:

10:42:09   5  **Q.**    Hello, Mrs. Jones.  My name is Albert Ratliff.  If

6  you don't understand my questions, let me know and I'll

7  clarify it for you.

8                At the airport you had about $4,000 on you;

9  is that correct?

10:42:20  10  **A.**    Yes.

11  **Q.**    And was those monies in your purse?

12  **A.**    In my wallet.

13  **Q.**    In your wallet?

14  **A.**    Yes.

10:42:27  15  **Q.**    Were there -- were they mostly one hundred-dollar

16  bills?

17  **A.**    It might be, I was shocked, so I'm not exactly sure.

18  **Q.**    Okay.  And you testified that you did not talk to

19  Officer Hernandez?

10:42:50  20  **A.**    Yes.

21  **Q.**    Did you hear what Officer Hernandez asked your

22  husband?

23  **A.**    I can't say that because I was mostly distracted with

24  my baby was complaining.

10:43:03  25  **Q.**    Okay.  And when you got to the inspection table, did

*Cross-Berekti Jones/By Mr. Ratliff*

1   you hear what Officer Clark Davila asked your husband?

2   **A.**   Yes.

3   **Q.**   And what did he ask your husband?

4   **A.**   He said, "Put everything y'all have on the table."

10:43:22   5   He mentioned traveler's checks, credit cards, debit cards,

6   cash, so we put everything on the table.  And with me I

7   couldn't give him the cash that I just pulled out my

8   wallet and hand him my wallet.

9   **Q.**   And did your husband have a jacket with him?

10:43:43   10   **A.**   It was handing over the one of the carryon bags.

11   **Q.**   And it was over the carryon bag?

12   **A.**   Yes.

13   **Q.**   When you and your husband was at the inspection

14   table?

10:43:55   15   **A.**   Yes.

16   **Q.**   And after you and your husband placed the -- your

17   currency traveler's checks on the table, that jacket was

18   still on the carryon bag; right?

19   **A.**   That's where he took out the money and put it on the

10:44:11   20   table.

21   **Q.**   Your husband took the money out?

22   **A.**   Yes, he did, traveler's checks from the carryon bags.

23   **Q.**   Okay.  When you are husband was taking the money out,

24   did your husband ever tell them, "Oops.  I'm sorry.  I

10:44:30   25   have more than $20,000.  I have about $30,000 in

*Cross-Berekti Jones/By Mr. Ratliff*

1  traveler's checks and in cash."  Did he ever say anything

2  like that?

3  **A.**   No.  Because the gentleman that was on the table, he

4  mentioned traveler's checks, credit card, so everything he

10:44:48   5  was mentioning we took out on the table.

6  **Q.**   And at that time did --

7          MR. RATLIFF:  May I approach the witness, Your

8  Honor?

9          THE COURT:  Yes.

10:45:01  10  BY MR. RATLIFF:

11  **Q.**   Did you ever see this form during the inspection

12  process?

13  **A.**   Yes, I might have, yes.

14  **Q.**   And when you looked at that form -- withdraw that

10:45:18  15  question.

16          At anytime, did your husband correct the

17  officers as to what was written on that form?

18  **A.**   No.  The officer was just counting the money, and

19  there was not much of discussion going on.

10:45:42  20  **Q.**   And your husband never told them that, "I have more

21  than $20,200," to the inspection officers -- did you ever

22  husband ever say that anything like that?

23  **A.**   I don't remember that.  Everything we had here I put

24  it on the table, so...

10:46:03  25          MR. RATLIFF:  No further questions, Your Honor.

1          THE COURT:  You may step down.  Thank you,

2 ma'am.

3          MR. CALLAHAN:  Your Honor, plaintiffs rest.

4          THE COURT:  Anything else, Mr. Ratliff?

5          MR. RATLIFF:  No, Your Honor.

6          THE COURT:  All right.  Give me about

7 15 minutes to compose my thoughts and I'll be right back.

8          **(Recessed at 10:46 a.m.)**

9          THE COURT:  Thank you, please be seated.  There

10 is no evidence that the Joneses, including the littlest

11 one, had any intention of violating any law at all.  There

12 is more to enforcing currency restrictions than playing

13 "gotcha."

14          The tickets these people bought to Addis,

15 Ababa, would have -- the two of them probably run about

16 $10,000.  Is that right, Mr. Jones?

17          MR. JONES:  18.

18          THE COURT:  $18,000.  So you're laundering

19 money, taking $30,000 and spending 18.  That sounds like

20 something the government would do.  You got no form from

21 Mrs. Jones.  You asked him for a guess, you got a guess and

22 then you played "gotcha."

23          That's not your uniform.  That's not the

24 Customs' uniform.  That's the uniform of the people of the

25 United States.  And I don't care whether the Joneses were

1  Icelandic or Canadian or any other awful group of people.

2                    Your job is to stop material, illegal

3  transactions.  And, incidentally, the 10,000-dollar limit

4  was set in 1984, because the institution for which you work

5  has inflated the currency $10,000 today -- I mean, $10,000

6  in 1984 is $22,361 now.

7                    If you didn't believe that's all Mr. Jones

8  had, you should have asked him to lay it out all on the

9  table and fill out the form correctly.  You're not mall

10  cops.  Don't act like them.  That the United States

11  attorney took this case is equally reprehensible.

12                    What you now have is an attempt to have a

13  statistic to your supervisors who sit in an air-conditioned

14  office with a clipboard and never have to frisk any dirty

15  tourist, can report some accomplishment to their superiors.

16                    They need to report what they are doing.

17  They're abusing people and not just American citizens,

18  people.  They're wasting the resources of the people who

19  are paying you.  Have some sense of purpose, perspective,

20  balance and responsibility.

21                    Faithfully executing the laws is not running

22  a speed trap at George Bush Airport.  There's no evidence,

23  you have no evidence.  Are you the supervisor?

24                    MR. TRAN:  No, sir.

25                    THE COURT:  Is there a supervisor here?  Of

1 course not.  We have one, two, three, four, five, six

2 officers.  And what do you do, Mr. Tran?

3                MR. TRAN:  I --

4                THE COURT:  No.  This guy.

11:03:22    5                MR. TRAN:  I'm sorry.

6                THE COURT:  Stand up when you talk to the

7 Court.

8                MR. TRAN:  I'm the case agent, sir.

9                THE COURT:  You've told me that before.  That

11:03:29   10 doesn't mean anything.  What it does mean is those guys did

11 the work.  That's what it means.  What's your job

12 description?

13                MR. TRAN:  I input the report in the system and

14 keep track of what happened to the case.

11:03:49   15                THE COURT:  And then you come here in front of

16 the case.  That's your contribution, and you make more than

17 they do?  Why don't you spend your time training them to be

18 thoughtful and energetic and careful.  And, incidentally,

19 fellows, I'm not minimizing the fact that there are a lot

11:04:14   20 of crazy people at that airport -- all airports -- but

21 you're not catching crazy people by setting up tourists.

22                To violate the law, you're entitled to

23 forfeiture, it's got to be a material violation, and it's

24 got to be intended.  These people were casual.  They made a

11:04:40   25 mistake.  Lots of people make mistakes, including you-all.

1           How much do you make a year, Mr. Tran.

2           MR. TRAN:  I make --

3           THE COURT:  Speak up.

4           MR. TRAN:  Approximately 65,000 a year.

11:05:01   5           THE COURT:  How long -- which part of

6  dysfunctional Homeland Security do you work for?

7           MR. TRAN:  I'm on the investigation side.

8           THE COURT:  Investigation.  So you type data

9  other people work, and you call that investigation?

11:05:19   10          MR. TRAN:  No, sir.  I say that I keep track of

11 what happened to this case so I can put the report in our

12 system.

13          THE COURT:  So you're an accounting clerk?

14          MR. TRAN:  For this case, yes.

11:05:37   15          THE COURT:  Well, what else do you do?

16 Remember, I'm paying your salary.  I want to know what you

17 do the rest of your day?

18          MR. TRAN:  Sir, I arrest people when they bring

19 drugs into the airport.

11:05:53   20          THE COURT:  When is the last time you did that?

21          MR. TRAN:  Last month.

22          THE COURT:  How much drugs did they have?

23          MR. TRAN:  Over a kilo.

24          THE COURT:  Why aren't you doing that instead

11:06:03   25 of harassing American tourists?

1                MR. TRAN:  This is, again, the lawsuit too,

2 sir.

3                THE COURT:  And where did you get your legal

4 education?

11:06:15  5                MR. TRAN:  From Sam Houston State University.

6                THE COURT:  And do you have a JD?

7                MR. TRAN:  I'm sorry?

8                THE COURT:  Do you have a doctorate of

9 jurisprudence degree?

11:06:28  10                MR. TRAN:  No, sir.

11                THE COURT:  You're not licensed, are you?

12                MR. TRAN:  I have a bachelor's degree in

13 criminal justice.

14                THE COURT:  And you're telling me the law?

11:06:44  15                MR. TRAN:  I'm sorry.  If they violate the law,

16 it's our job to enforce the law.

17                THE COURT:  They didn't violate the law.  In a

18 casual exchange of a almost tricky processing.  Why

19 wouldn't you just say, "Let's double-check if you're

11:07:11  20 guessing.  Put all your money on the table"?  Why didn't

21 you do that?  Because you weren't there.  But why don't you

22 train people to do that?  Well, you were busy arresting

23 drug dealers.

24                MR. TRAN:  Can I speak?  I was there on that

11:07:30  25 day, but there are requirements that if you fly out

1  overseas, you have to report the money that you have.

2             THE COURT:  Mr. Tran, I have two

3  gubernatorial's, one presidential appointment, and two law

4  degrees in addition to my undergraduate degree.  I

11:07:52  5  understand it.  I've actually flown airplanes overseas.

6  I've taken boats overseas.  I've filled out my currency

7  transaction reports.  Not everybody has had the benefit of

8  the education.

9             I also know how difficult people can be

11:08:16  10  coming in and going out of the country.  So your idea of

11  law enforcement is you catch somebody doing something, you

12  squash them.  You don't think through whether they met the

13  intent requirement of the statute.

14             MR. TRAN:  Sir, our job is enforce the law, and

11:08:42  15  something else, it's not up to me.

16             THE COURT:  So if you were a highway patrol

17  officer, you'd never give anybody a warning?  Is that what

18  you're telling me?

19             MR. TRAN:  They do.

11:08:57  20             THE COURT:  I know they do.  You just told me

21  you wouldn't.  No matter what, you hammer them.  That's not

22  law enforcement.  That's a thug in a uniform; on your case,

23  a blue suit.

24             Is "service" anywhere in the motto of

11:09:30  25  Homeland Security?  The Italian equivalent of the FBI's

1 motto, that means you can, run but you can't hide.  I think

2 that's at least candor.  Is "service" in the motto?  Do you

3 know what the motto is?

4          MR. TRAN:  No, sir.

5          THE COURT:  No.  Well, that's comforting to

6 know that you don't even know what the slogan is for your

7 own agency, my agency.  It's not crush civilians, and

8 that's not what enforcing the law is.  There are plenty of

9 awful people out there.

10          You're the kind of guy that would arrest

11 the bank robber for littering because the shell casings hit

12 the pavement after he shot the teller.  Service is part of

13 it, judgment is part of it.

14          There's a reason there's a currency

15 report.  These people were not the reason, and you didn't

16 find it hidden inside the lining of a suitcase.  You found

17 it in his jacket pocket, sneaky devil that he is, in her

18 purse, in her wallet in her purse.

19          Aren't those the facts?  Mr. Tran, when I

20 ask you a question it's traditional for you for answer it?

21          MR. TRAN:  Yes, sir, that's the fact.

22          THE COURT:  The motto of your agency is

23 vigilance, service, integrity.  Maybe you ought to memorize

24 that.

25          MR. TRAN:  Yes, sir.

1           THE COURT:  Maybe you want to look them up to

2  make sure you know what they mean.  And those men are

3  responding to the incentives that are indicated by the 19

4  layers of bureaucrat between them and Washington.

11:11:51    5           They get memos and told how to cut corners

6  and do things, instead of how to do it right, solidly.

7  They need the job, they need the work.  I can't do it in

8  Latin.  Somebody could, but you wouldn't understand it, I

9  trust, I wouldn't either, but who will guard the guardians?

11:12:29   10           Gentlemen on the back -- sit down, Tran.

11  Don't act so that you don't need a guardian.  And if some

12  weasly bureaucrat who doesn't do much except travel around

13  in a government car and make trouble for people, tells you

14  to do something that's wrong, just remember:  Following

11:12:51   15  orders is not a defense.  It may lie.  It wasn't a defense

16  at Andersonville, it wasn't a defense at Nuremburg.  It's

17  not a defense here.

18           If you get told to do something wrong,

19  don't do it.  While Tran is trying to memorize the three

11:13:15   20  words of his agency's motto, you might pick up one of these

21  pocket constitutions and read it.

22           Homeland Security does not run America.

23  It works for America.

24           By when can you have the money back to the

11:13:35   25  Joneses, Mr. Ratliff?

1            MR. RATLIFF:  Your Honor, I'll process the
2  request today, ask them to do it as expeditiously as
3  possible.  I can't really can't give an estimate, Your
4  Honor.
11:13:52  5            THE COURT:  All right.  Mr. Callahan?
6            MR. CALLAHAN:  Yes, Your Honor.
7            THE COURT:  You want the money to be delivered
8  to you?
9                 Are they going to do it by wire transfer,
11:14:03  10  or do they actually write checks still?
11            MR. RATLIFF:  Your Honor, they can do it both
12  ways.  May I suggest as soon as I get an order from you, I
13  will process it.  If you wish to have it wire transferred,
14  I can submit the appropriate form to you, you complete it
11:14:18  15  and we can process it as a wire transfer.
16            THE COURT:  It might be better if they get a
17  check.  You can send a check to him.
18            MR. RATLIFF:  Yes, I can.
19            THE COURT:  And then he can hand the check to
11:14:29  20  the client.
21            MR. RATLIFF:  Yes, Your Honor.
22            THE COURT:  I'll do that.  Some people don't do
23  checks anymore.  What about attorney's fees?
24            MR. RATLIFF:  Just have to wait for the motion
11:14:43  25  from the plaintiff.

1                THE COURT:  There is one, isn't there?

2                MR. CALLAHAN:  Your Honor, I think we said we'd

3  provide one within Rule 54, just sort of the normal

4  procedure once final judgment to submit, submit billing

11:14:57    5  records, Lodestar and that sort of thing.  I can write a

6  very short --

7                THE COURT:  Can you estimate now?  Do you know

8  what Lodestar is?

9                MR. CALLAHAN:  Our fee times are reasonable

11:15:10   10  hours.

11                THE COURT:  No.  I want you to go home, and

12  while he's looking up service and integrity and vigilance,

13  I want you to go home and look up what a Lodestar really

14  is.

11:15:21   15                MR. CALLAHAN:  I will.

16                THE COURT:  Not what the Court's use it to

17  mean, but what does it really mean.

18                MR. CALLAHAN:  I'll do that.

19                THE COURT:  Do you have an estimate of what you

11:15:29   20  think your fees are?

21                MR. CALLAHAN:  I don't just because so much of

22  the time we've spent has been on Sunday and Monday of this

23  week, so I would have a hard time coming up with an

24  estimate right now.  I'm happy to provide it this afternoon

11:15:39   25  if I can get back to my office.

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*

1          THE COURT:  What's today?  Today is Tuesday.

2          MR. CALLAHAN:  Today is Tuesday.

3          THE COURT:  Thursday at noon.

4          MR. CALLAHAN:  Yes, Your Honor.

11:15:54   5          THE COURT:  So would you please check your

6  e-mail, the docket sheet.  I guess they e-mail it to you,

7  don't they?

8          MR. RATLIFF:  Yes, Your Honor.

9          MR. CALLAHAN:  We'll provide --

11:16:06   10          THE COURT:  And you stay in your office and

11  he'll call you and say you're crazy, or almost right, or

12  something, so we can see if we can save additional time.

13          MR. CALLAHAN:  I'll call Mr. Ratliff.

14          THE COURT:  Now, I just want to point out that

11:16:34   15  your daughter is doing what most lawyers would like to do

16  while I talk.  She's sleeping through it.

17              All right.  Anything else from anybody.

18          MR. RATLIFF:  Your Honor, just for the record,

19  I move to substitute this copy for Exhibit 2.

11:16:52   20          THE COURT:  I already have it, don't I?

21          MR. RATLIFF:  No, Your Honor.  This is the

22  actual Exhibit 2.  That's the working copy.  We can use

23  that for the record, though.  Okay.  Yes, Your Honor.

24          THE COURT:  I don't want the poster.  Thank

11:17:08   25  you.  It would be a better poster if it said currency and

1   in monetary instruments all one line, but they'll fix that.

2              All right.  So the exhibits are all in,

3   and you may withdraw that.  Anything else?

4              MR. RATLIFF:  Yes, Your Honor.

5              MR. CALLAHAN:  No, Your Honor.

6              THE COURT:  All right.  Thank you, Counsel.

7              **(Recessed at 11:17 a.m.)**

8              **COURT REPORTER'S CERTIFICATE**

9

10   I, Johnny C. Sanchez, certify that the foregoing is a

11   correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14              /s/ _____
                Johnny C. Sanchez, CRR, RMR

15

16

17

18

19

20

21

22

23

24

25

*Johnny C. Sanchez, RMR, CRR - jcscourtreporter@aol.com*